**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **GLENDA MACHUCA o/b/o M.C., a minor,** : | |
| : | **CIVIL ACTION NO. 1:06-1312** |
| **Plaintiffs** : | |
| : | **(CALDWELL, D.J.)** |
| v. : | **(MANNION, M.J.)** |
| : | |
| **MICHAEL J. ASTRUE[1], Commissioner of Social Security,** : | |
| : | |
| **Defendant** : | |
| : | |

## REPORT AND RECOMMENDATION

This is a Social Security disability case wherein the plaintiff is seeking review of the decision of the Commissioner of Social Security, ("Commissioner"), which denied her minor son's claim for Supplemental Security Income, ("S.S.I."), as a disabled child under Title XVI of the Social Security Act, ("Act"), 42 U.S.C. §§1381-1383(d).

**I. Background.**

On November 29, 2004, the plaintiff, Glenda Machuca, filed an application for S.S.I. on behalf of her son, a child under the age of 18, alleging that he was disabled as of December 19, 1998, as a result of

---

[1]Michael J. Astrue became the Commissioner of Social Security effective February 12, 2007. Under Fed.R.Civ.P. 25(d)(1) and 42 U.S.C. §405(g), Michael J. Astrue is automatically substituted as the defendant in this action.

respiratory disease, Attention Deficit Hyperactivity Disorder, ("A.D.H.D."), and behavioral problems. (TR. 57-68, 85-88).

After the claim was denied initially, a timely request for a hearing before an Administrative Law Judge, ("A.L.J."), was filed. A hearing was conducted on February 8, 2006. (TR. 32, 208-31). The plaintiff, who was represented by counsel, appeared at the hearing, but did not testify. The plaintiff's mother appeared and testified at the hearing. On March 13, 2006, the A.L.J. issued an unfavorable decision. (TR. 15-26).

The plaintiff requested review of the A.L.J.'s decision by the Appeals Council, which concluded that there was no basis upon which to grant the plaintiff's request. (TR. 5-10). Therefore, the decision of the A.L.J. became the final decision of the Commissioner.

On July 3, 2006, the plaintiff filed the instant action seeking judicial review of the decision of the Commissioner. (Doc. No. 1). The plaintiff filed a brief in support of her appeal on October 9, 2006. (Doc. No. 9). The defendant filed an opposing brief on November 7, 2006. (Doc. No. 10).

**II. Eligibility Evaluation Process for Children.**

In 1996, Congress altered the statutory disability standard for children seeking S.S.I. Pub. L. No. 104-193 (August 22, 1996). Section 211(a)(4) of the 1996 legislation, codified at 42 U.S.C. §1382c(a)(3)(C)(i) provides:

>An individual under the age of 18 shall be

2

> considered disabled for the purposes of this title if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

Pub. L. No. 104-193 §211(a)(4).

On September 11, 2000, the Social Security Administration published new rules relating to childhood disability cases. See 65 Fed. Reg. 54, 747. Effective January 2, 2001, the new rules applied to claims pending at any stage of the administrative review process. 65 Fed. Reg. at 54, 751. The rules prescribe a three-step sequential evaluation, under which the A.L.J. must consider: (1) whether the child is engaging in substantial gainful activity; (2) whether the child has a medically determinable impairment (physical or mental) or combination of impairments that is severe; and, if the impairments are severe, (3) whether the child's impairment meets, medically equals, or functionally equals, in severity, any of the listed impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1. See, 20 C.F.R. §416.924(a).

A child meets the listing if the specific findings detailed within the description of a listing exist with respect to that child's diagnosis. 20 C.F.R. §416.924(d)(1).

A child medically equals a listing if the medical findings, with respect to the child's impairment, are at least equal in severity and duration to the listed findings. 20 C.F.R. §416.926(a).

A child functionally equals a listing when she has a severe impairment that results in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. §416.926a(a). There are six domains of functioning used in determining functional equivalence: (1) acquiring and using information; (2) attending to and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) ability to care for oneself; and (6) health and physical well-being. 20 C.F.R. §416.926a(b)(1)(i)-(vi).

A marked limitation in a domain is found when an impairment interferes seriously with an individual's ability to independently initiate, sustain, or complete activities. 20 C.F.R. §416.926a(e)(2). A marked limitation is more than moderate but less than extreme. Id.

An extreme limitation in a domain is found when the impairment interferes "very seriously" with the individual's ability to independently initiate, sustain, or complete activities. 20 C.F.R. §416.926a(e)(3). An extreme limitation is more than marked and is given to the worst limitations. Id. However, it does not require a total lack or loss of ability to function. Id.

An additional factor which is considered in determining functional equivalence is an assessment of whether or not the activities of the child asserting disability are typical of other unimpaired children of the same age. 20 C.F.R. §416.926a(b)(2).

**III. Evidence of Record.**

The medical evidence of record, as summarized by the A.L.J. and the parties, establishes that on October 19, 2004, the plaintiff treated with Edwin Feliciano, M.D.  At that time, the plaintiff's mother indicated that he was hyperactive, inattentive, impulsive, intrusive, and aggressive towards his peers at school and his sisters at home.  Dr. Feliciano noted that the plaintiff had no history of psychiatric hospitalizations or outpatient treatment and had no other medical problems. The plaintiff was noted to be somewhat hyperactive and inattentive during the evaluation, but there was no evidence of psychosis or mania, suicidal or homicidal ideations, and no other cognitive deficits.  The plaintiff's mood was "good" and his affect was appropriate. The plaintiff was noted to have adequate insight and judgment.  Dr. Feliciano diagnosed A.D.H.D., combined type, and assigned the plaintiff a Global Assessment of Functioning, ("G.A.F."), score of 45-50[2].  Dr. Feliciano

---

[2]A G.A.F. score represents "the clinician's judgment of the individual's overall level of functioning."  American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) at 30 (4th ed. 1994).  The G.A.F. score is taken from the G.A.F. scale which is "to be rated with respect only to psychological, social and occupational functioning."  Id.  The G.A.F. scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death).  Id. at 32.

A G.A.F. score between 41-50 denotes "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no
(continued...)

discussed the possibility of medication, but first ordered blood work. He recommended individual and family therapy and requested that the plaintiff's teacher fill out a behavioral assessment. (TR. 167-68).

On November 5, 2004, Sudhakumar Madapoosi, an adolescent psychiatrist, evaluated the plaintiff. The plaintiff was noted to have no history of taking any psychotropic medications. The plaintiff's mother reported that she had not received any major complaints from school concerning the plaintiff's behavior, but was concerned about his home behavior. She reported that neighbors had complained that her son was a troublemaker. In addition, she reported that he did not get along with other children and fought constantly. Upon examination, the plaintiff was noted to be hyperactive, oppositional, and defiant. The plaintiff was noted to make poor eye contact and was unengaging. It was noted that the plaintiff was not psychotic, nor did he pose a danger to himself or others. He was of average intelligence with an intact memory. Dr. Madapoosi diagnosed the plaintiff with disruptive disorder and assigned a G.A.F. of 50. The plaintiff was prescribed Dextrostat. (TR. 139-41).

The plaintiff followed up with Dr. Madapoosi on December 16, 2004. At that time, the plaintiff's mother reported that the medication was not

---

(...continued)
friends, unable to keep a job)." American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders DSM-IV-R at 34 (4th ed. 2000).

effective. As such, the plaintiff's medication was changed to Adderall XR. (TR. 138).

On December 21, 2004, the plaintiff treated with Dr. Feliciano, who noted that his blood tests were within normal range. Upon examination, Dr. Feliciano noted that the plaintiff had good eye contact. His speech was normal. He was hyperactive and inattentive during the interview. There was no evidence of psychosis or mania. The plaintiff reported no suicidal or homicidal ideations. No other cognitive defects were noted. The plaintiff's mood was noted to be good and his affect appropriate. His insight and judgment were noted to be adequate. Dr. Feliciano prescribed the plaintiff Adderall XR[3], recommended that he continue with therapy, and assigned a G.A.F. of 45-50. (TR. 166).

On February 21, 2005, Dr. Madapoosi noted that the plaintiff's mother reported that the plaintiff continued to use foul language and became aggressive easily. The plaintiff was continued on Adderall. (TR. 178).

---

[3]It would appear that Dr. Feliciano was unaware of the medications being prescribed by Dr. Madapoosi, and vice versa. To this extent, one week prior to Dr. Feliciano prescribing the plaintiff 5 m.g. of Adderall XR in the morning, Dr. Madapoosi had prescribed 10 m.g. of Adderall XR in the morning for the plaintiff. Subsequently, in February 2005, Dr. Feliciano changed the plaintiff's prescription from Adderall to Concerta, after complaints of frequent blinking secondary to the medication. Despite this, Dr. Madapoosi apparently continued to prescribed the plaintiff Adderall and, in fact, increased the plaintiff's dosage in May of 2005, after the plaintiff's mother complained that the medication was not effective.

The next day, on February 22, 2005, the plaintiff treated with Dr. Feliciano. At that time, the plaintiff's mother reported frequent blinking secondary to the Adderall, and indicated that the plaintiff was not responding to the medication. Upon examination, the plaintiff was noted to have good eye contact. His speech was normal. He was noted, however, to be hyperactive, inattentive, impulsive and intrusive during the interview. There was no evidence of psychosis or mania. No suicidal or homicidal ideations were noted. No other cognitive deficits were noted. The plaintiff's mood was noted to be good and his insight and judgment appeared to be adequate. Dr. Feliciano discontinued the plaintiff's Adderall and started Concerta. (TR. 165).

In March 2005, a state agency medical expert reviewed the plaintiff's medical records and determined that he had no limitation to less than marked limitations in all domains of functioning. (TR. 144-48).

On May 17, 2005, Dr. Feliciano responded to interrogatories presented to him by the plaintiff's attorney. Dr. Feliciano indicated that the plaintiff had marked limitations in the areas of inattention; impulsiveness; hyperactivity; social functioning; and maintaining concentration, persistence, or pace. (TR. 152-54).

On May 26, 2005, the plaintiff's mother reported to Dr. Madapoosi that the plaintiff was not doing well at home or school and that he was hyperactive and restless. Dr. Madapoosi increased the plaintiff's dosage of Adderall.

(TR. 177).

On May 31, 2005, Dr. Feliciano reported that the plaintiff was responding to the Concerta medication and reported no side effects other than some decrease in his appetite. It was noted that the plaintiff continued to eat healthy and adequate and did not lose any significant amount of weight. His hyperactivity, inattention, and impulsivity were "better-controlled" at home and school with the medication. The plaintiff was noted to continue to have "some" behavior problems with neighborhood children. It was further indicated, however, that the neighborhood was considered "quite chaotic and dangerous." Upon examination, Dr. Feliciano indicated that the plaintiff's eye contact was good. His speech was normal. There was no evidence of psychomotor disturbances. No psychosis or mania. No suicidal or homicidal ideations. No cognitive deficits. The plaintiff's mood was noted to be "OK" and his affect was appropriate. The plaintiff's insight and judgment were noted to be adequate. The plaintiff's G.A.F. was rated at 50-55[4]. The plaintiff was continued on Concerta. (TR. 164).

On September 22, 2005, the plaintiff treated with Francis Daly, M.D., of Pennsylvania Counseling Services, who took the place of Dr. Feliciano. Dr. Daly diagnosed the plaintiff with A.D.H.D., combined type, and

---

[4] A G.A.F. of 51 to 60 is assigned to a person who has only "moderate" symptoms or "moderate" difficulty in social, occupational, or school functioning. DSM-IV at 34.

9

oppositional defiant disorder, ("O.D.D."). He noted that the plaintiff was doing well on Concerta, that he was experiencing no insomnia and was eating well. The plaintiff was continued on his medications. (TR. 162).

In October 2005, a treatment plan from Pennsylvania Counseling Services indicated that the plaintiff was very attentive and listening when the therapist spoke. He was noted to be somewhat hyperactive. He denied any thoughts of hurting himself or others. He had no auditory or visual hallucinations. His mood was good and affect was appropriate. His insight and judgment were adequate. He interacted appropriately with his mother and sibling during the session. The plaintiff reported that he "loved" to play outside and enjoyed playing computer games, soccer, and Playstation with his friends. The plaintiff was noted to have improved in his goals of decreasing aggressive behavior and not yelling or being defiant towards others. (TR. 179-83).

On November 11, 2005, the plaintiff again treated with Dr. Daly. At that time, the plaintiff's mother reported that the plaintiff had insomnia with hallucinatory symptoms of seeing things outside the window and voices telling him to get a knife. As a result, Dr. Daly discontinued the Concerta and prescribed Risperdal. (TR. 160-61).

On November 17, 2005, Dr. Daly noted that the plaintiff had some improvement with visual and auditory hallucinations. He altered the plaintiff's diagnosis to include Bipolar, NOS, and continued the Risperdal. (TR. 158-

59).

On December 29, 2005, without any noted reason, Dr. Daly increased the plaintiff's dosage of Risperdal. The plaintiff was given a G.A.F. of 55. (TR. 156-57).

On January 31, 2006, Dr. Daly noted that the plaintiff's mother reported that he was still seeing faces and hearing voices. She further reported that he continued to be oppositional and had changed babysitters four times. Dr. Daly discontinued the Risperdal and was noted to consider Abilify. (TR. 205-06).

On February 14, 2006, Dr. Daly responded to interrogatories provided by the plaintiff's attorney. In doing so, Dr. Daly opined that in the context of A.D.H.D., the plaintiff suffers from medically documented marked impairments as to inattention, impulsivity, and hyperactivity, and opined that the plaintiff suffers from marked impairment in age appropriate social and personal functioning, and cognitive/communicative functioning, documented by history and medical findings, and marked difficulties in maintaining concentration, persistence, and pace. He also opined that in the context of bipolar disorder, the plaintiff suffers from marked impairment in age-appropriate social and personal functioning, and cognitive/communicative functioning, documented by history and medical findings, and marked difficulties in maintaining concentration, persistence, and pace. Dr. Daly opined that the plaintiff's impairments would last for at

11

least one year despite prescribed medication. (TR. 194-95).

The plaintiff saw a therapist, Luz Amparo Betancur, fourteen times between November 9, 2005, and February 22, 2006. In a letter dated February 22, 2006, Ms. Betancur indicated that, during her sessions with the plaintiff, he exhibited a short attention span, potentially dangerous activities, difficulty sustaining attention on a consistent basis, and susceptibility to distraction by extraneous stimuli. She further indicated that the plaintiff would give the impression that he was not listening well, repeatedly failed to follow through on instructions, had poor organization skills, and demonstrated forgetfulness and hyperactivity. (TR. 197).

With respect to school records, on February 15, 2005, the plaintiff's kindergarten teacher, Mr. Waterdorf, completed a "Teacher Questionnaire" indicating the plaintiff's overall functioning. Mr. Waterdorf noted that he is with the plaintiff approximately six hours a day, five days a week. He reported that the plaintiff's dominant language is English. He was on grade level for math, did not require special services, and did not have an unusual degree of absenteeism. He had no problems acquiring and using information, attending and completing tasks, or moving and manipulating objects. Mr. Waterdorf further reported that the plaintiff had a slight problem (occurring monthly) expressing anger appropriately and respecting/obeying adults in authority. The plaintiff had no problems in other activities involving interacting and relating to others. In the area of caring for oneself, the

plaintiff had a slight problem (occurring monthly) handling frustration appropriately, identifying and appropriately asserting emotional needs, calming himself, using appropriate coping skills to meet daily demands of school environment, and knowing when to ask for help. Overall, Mr. Waterdorf reported that the plaintiff was an exceptional student. In fact, he chose the plaintiff as "Student of the Month." The plaintiff participated in class and got along "very well" with his classmates. The plaintiff earned an overall average assessment of "proficient[5]" to "advanced[6]" during the kindergarten school year. He was "competent[7]" in all areas of social and work skills during the first period. During the second period, he was "exceptional[8]" in the areas of observing rules and regulations, working and playing cooperatively, practicing courtesy and respect, staying on task, working independently, and respecting school and personal property. During the third period, he was "exceptional" in all of the previous stated areas except practicing courtesy and respect (he was "competent") and respecting

---

[5] A proficient rating indicates that the student meets grade level standards with evidence of independent thinking. (TR. 83).

[6] An advanced rating indicates that the student goes beyond grade level standards and independently explores ideas and topics. (TR. 83).

[7] A competent rating indicates that the student meets expectations (TR. 83).

[8] An exceptional rating indicates that the student consistently exceeds expectations. (TR. 83).

school and personal property (he was "competent").  Also during the third period, the plaintiff improved from being "competent" to "exceptional" in the areas of respecting authority, displaying a positive attitude, displaying self-confidence, and seeking help when needed.  By the forth period, the plaintiff returned to "exceptional" in the areas of practicing courtesy and respect and respecting school and person property.  Finally, he was "exceptional" in demonstrating self-control by the fourth period, an improvement from being "competent."  (TR. 73-80, 109-10).

The plaintiff maintained his "proficient" to "advanced" rating in first grade.  During the first period, he was "exceptional" in all areas of speaking and listening, and social and work skills.  This rating continued through the second period, except that he received a "competent" rating in the area writing neatly and legible.  (TR. 110).

At the hearing before the A.L.J., the plaintiff's mother testified that she received more complaints about the plaintiff's behavior from his kindergarten teacher than from the first grade teacher.  (TR. 217).  She indicated that she received reports from school that her son "throws himself on the floor and sometimes he doesn't want to listen." (Id.).  At home, she testified that the plaintiff punches and talks bad to his sisters.  (Id.).  When he is "very, very" upset, the plaintiff's mother testified that he goes in his room.  (TR. 218). The plaintiff's mother testified that he fights a lot with the neighborhood children and is labeled a troublemaker by parents in the neighborhood.  (TR.

14

220).

The plaintiff was also present at the hearing before the A.L.J., but did not testify. To this extent, it was noted that, while the plaintiff was initially cooperative, his mother had to later drag him into the hearing room, after which he sat with his back turned to the A.L.J. and refused to answer any questions. (TR. 226-27). The plaintiff then crawled under a table and refused to come out. (TR. 229).

**IV. Discussion.**

The plaintiff initially argues that there was not substantial evidence in the record to support the A.L.J.'s finding that the statements by the plaintiff's mother were not entirely credible as to the intensity, duration, and limiting effects of the plaintiff's symptoms.

It is well-established that the A.L.J. is responsible for resolving evidentiary matters, determining a witness's credibility, and weighing all evidence. "The A.L.J. is empowered to evaluate the credibility of witnesses, and his findings on the credibility of claimants are to be accorded great weight and deference, particularly since an A.L.J. is charged with the duty of observing a witness's demeanor and credibility." Irelan v. Barnhart, 243 F.Supp.2d 268, 284 (E.D.Pa.2003)(internal quotations and citations omitted). More specifically, the ALJ must determine the extent to which a claimant is accurately stating the degree of pain and the extent to which he or she is

disabled by it. Id.(citing Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir.1999)). "[T]he ALJ may 'reject the claimant's claim of disabling pain if he affirmatively addresses the claim in his decision, specifies the reason for rejecting it, and has support for his conclusion in the record.'" Id.(citing Hirschfeld v. Apfel, 159 F.Supp.2d 802, 811 (E.D.Pa.2001)).

Here, the plaintiff's mother claims that the plaintiff's impairments were so severe as to render him totally disabled under the listings. However, the educational and objective evidence of record does not support her claims. To this extent, there is no evidence of any psychiatric hospitalization, outpatient treatment, or any other medical problems. Upon examination of the plaintiff, it was repeatedly noted that there was no evidence of psychosis or mania, suicidal or homicidal ideations, or any other cognitive defects. The plaintiff was repeatedly noted to have a good mood and appropriate affect. His insight and judgment were repeatedly noted to be adequate. The main objective findings reflect some problems with hyperactivity and inattentiveness. However, there is no objective evidence that this was of listing level.

Further, despite the claims of the plaintiff's mother, at the plaintiff's initial psychiatric evaluation, she reported that she had not received any major complaints from school with respect to the plaintiff's behavior. In fact, school records indicate that the plaintiff performed at grade level for math and did not require any special services. He did not have a concerning

16

degree of absenteeism.  The plaintiff had no problems acquiring or using information, attending and completing tasks, or moving or manipulating objects.  The plaintiff was noted to have only a slight problem in expressing anger appropriately and respecting/obeying adults in authority.  However, he was noted to have no problems in other activities involving interacting and relating to others.  The plaintiff was noted to have only a slight problem in caring for himself with respect to handling frustration appropriately, identifying and appropriately asserting emotional needs, calming himself, using appropriate coping skills to meet daily demands of the school environment, and knowing when to ask for help.  (TR. 73-78).

Overall, the plaintiff's kindergarten teacher indicated that he was an "exceptional" student, who participated in class and got along well with his classmates. The plaintiff was noted to be proficient to advanced in kindergarten, with ratings of competent to exceptional in all areas.  The plaintiff was noted to have maintained his proficient to advanced rating into the first grade, and again was rated competent to exceptional in all areas.

In light of the above educational and objective evidence of record, the A.L.J.'s finding that the complaints of the plaintiff's mother were not entirely credible is supported by substantial evidence in the record.  Therefore, the plaintiff's appeal should be denied to the extent it is argued otherwise.

The plaintiff also argues that the A.L.J. failed to obtain the opinion of a medical expert to resolve the discrepancy between the reports of the

17

plaintiff's mother and physicians, on the one hand, and the plaintiff's school records on the other.

Pursuant to the Regulations, the enlistment of a medical expert is discretionary.  See 20 C.F.R. §416.927(f)(2)(iii).  See also Cordovi v. Barnhart, 2005 WL 3441222, at *3 (E.D.Pa. Dec.14, 2005).  Moreover, it is for the A.L.J. to weigh evidence that is inconsistent in order to make a determination as to disability.  See 20 C.F.R. §416.927(c)(2).  Therefore, the A.L.J. was not required to consult a medical expert to resolve the inconsistencies between the reports of the plaintiff's mother and physicians and those of the plaintiff's school, and the plaintiff's appeal should be denied on this basis as well.

Finally, the plaintiff argues that the A.L.J. erred when he relied on the state agency physician's assessment, as opposed to the treating physicians assessments with respect to the plaintiff's level of limitations.

In order to be entitled controlling weight, a treating physician's opinion must be "well supported by medically acceptable clinical and laboratory diagnostic techniques" and must not be "inconsistent with the other substantial evidence" in the record.   20 C.F.R. §416.927(d)(2).

In Jones v. Sullivan, 954 F.2d 125 (3d Cir. 1991), the court held that, in the absence of contradictory medical evidence, an administrative law judge must accept the medical judgment of a treating physician.  However, the court also noted that these opinions need not be accepted where they are

conclusory and unsupported by the medical evidence or where the opinions are contradicted by the opinions of other physicians, including state agency physicians, who reviewed the findings of the treating physicians and concluded that these findings do not reveal a condition that would preclude gainful employment.

State agency medical consultants are "highly qualified" physicians and experts in the evaluation of the medical issues in disability claims under the Act, and their opinions are entitled to weight. See Social Security Ruling 96-6p and 20 C.F.R. §416.927(f).

In Williams v. Sullivan, 970 F.2d 1178 (3d Cir. 1992), the court noted that while the administrative law judge may not base a decision upon his own interpretations of the significance of medical data, this does not prevent the administrative law judge from weighing medical reports against internal contradiction and other contradictory medical evidence.

In this case, the state agency physician, Anjana V. Popat, M.D., reviewed the plaintiff's medical records and determined that the plaintiff did not have marked or extreme limitations in any area of functioning. In doing so, Dr. Popat noted that the plaintiff's school reported only minor behavioral difficulties which did not require any intervention. Dr. Popat further indicated that because the plaintiff's behavioral problems were not consistent at home and school, his limitations were not considered marked. Although the plaintiff's treating physicians responded to interrogatories provided by the

plaintiff's attorney in which they indicated that the plaintiff had marked in limitations in numerous areas, as outlined above, the objective findings and notations do not support these conclusions. In addition, it would appear that their assessments were based largely on the subjective complaints of the plaintiff's mother. Therefore, considering the record as a whole, the A.L.J. was justified in relying on the opinion of the state agency physician, who opined that the plaintiff's impairments were not of listing level severity.

**V. Conclusion.**

On the basis of the foregoing, **IT IS RECOMMENDED THAT:** the plaintiff's appeal from the decision of the Commissioner of Social Security, **(Doc. No. 1)**, be **DENIED**.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States Magistrate Judge**

**Dated:  August 14, 2007**
O:\shared\REPORTS\2006 Reports\06-1312.01.hhs.wpd